May it please the court, counsel. Good morning, your honors. I'm Carrie Bryson, and on behalf of the Office of the State Appellate Defender, I represent Kelly Klein in this appeal. In the briefs we've raised five issues. I plan to focus my arguments today on those issues dealing with the medical evidence in this case, but I'd be happy to address questions on any of the issues we've raised. Just a quick factual background. The testimony in this case, the direct evidence about what happened here, was Kelly Klein operated a licensed daycare out of her home. She cared for several children, one of them being O.D., the child involved in this case. On August 29th of 2007, around 2.30 in the afternoon, Kelly called O.D.'s mother to tell her that O.D. had bumped his head on her tile floor, and that he had been up on all fours or pushed up on his arms and lunged forward, fell forward, and bumped his head on the tile floor. About 45 minutes later, the mom called back to Kelly's house to check on the child and see how he was doing, and Kelly informed her that he had a pretty decent goose egg on his head. Other witnesses who testified at trial observed that same mark on the child's head, a swollen bump on the forehead. Kim said she was worried about a concussion and so she decided to go pick up O.D. early. That was the only direct evidence about what happened in this case. Based on that testimony, there's no crime here. So how did we get from that to a charge of aggravated battery of a child? Really, the case hinged on the medical evidence, because there were no other competent eyewitnesses. There was no video of what was going on in the house. Nobody else saw what happened, and Kelly didn't make any sort of incriminating statement. So we're left with the facts I just explained. So the medical evidence, the prosecution's case hinged on that medical evidence. The state's doctors testified that the injuries that O.D. ultimately had suffered, that were identified by the doctors, could not have happened the way Kelly described. But they couldn't say how they happened, or when they happened, or exactly what happened. The defense expert, on the other hand, testified that the injuries could have happened exactly as Kelly had described, because there was a pre-existing medical condition that the child in this case had. And the key disagreement in this case between those experts was whether that condition existed. And that condition being an increased level of what's called extra axial fluid. So I don't get tongue tied, I may just refer to it as increased fluid, as we're discussing the case. The state's expert, Dr. Saving, said she didn't dispute that with that condition, with the increased fluid, you could get more serious effects, including a subdural hematoma, which was the brain injury identified in this case. On the question, though, of whether the child had this increased fluid condition, the court actually heard four expert opinions, even though only two doctors testified to what those opinions were. Three of the opinions were introduced by the state's key expert, Dr. Saving, through her testimony. Really, only her opinion should have come in, and that's the issue we've argued in issue two of the briefs. And then only one expert opinion was presented by the defense. Ultimately, we've argued there should have been two, and counsel was ineffective for not calling a treating doctor. And I want to talk about those two issues a little bit. I hope it doesn't sound like we're just adding up the numbers here. It was three to one in trial, and it really should have been one to two in the defense favor, because that's not what it boils down to. It's not just a numbers game. This was a key area of dispute, whether this fluid was present. And in making that determination, the court acknowledged there were conflicting medical opinions. The court's decision on how to resolve those opinions was, well, I believe the doctors who actually saw the child. So that was all of the state's witnesses and not the defense expert that was called. Part of that is by virtue of how this case unfolded. Kelly wasn't charged until six and a half months after this incident. She couldn't possibly have had somebody called in to examine the child at the time. But what she did have and what counsel should have presented was this Dr. Spomar, whose opinion would have corroborated the hired defense expert, Dr. Plunkett. Dr. Spomar was not a hired doctor. He was a treating physician at OSF when the child was taken to Peoria. And he identified this condition in the child, and he couldn't possibly have known when he made that finding that there was going to be a criminal case here. He was doing what he needed to do to treat the child, examining what had happened to treat the child. And that was his sole interest. And so his testimony, had the defense attorney chose to offer it, would have been compelling. Problematic, though, is that the state presented three opinions on this extra axial fluid condition, but only through one doctor. And that was their key expert, Dr. Saving. And it was error to allow her to testify to both her own opinion and then those of two non-testifying radiologists. What other things aided her in making that opinion? Her testimony was she reviewed the scans herself. The opinion was based on these CT scans that were taken at one of the hospitals. I mean, under Wilson v. Clark, you could use as a basis for your opinion other things that Dr. Spomar may rely on, which could include other opinions from other doctors. It can, but those are admissible for the limited purpose of explaining the testifying expert's opinion. But she didn't use those to explain her opinion. She explained that her opinion was based on her review. It's not necessarily explained. It's the basis. She used that as the basis under Wilson v. Clark. Okay, we're saying basis. Again, her basis for her opinion was her personal review of those scans. She testified. She reviewed the CT scans. She identified that this condition didn't exist. But then she also consulted with these other doctors, and then she testified, by the way, their opinions are the same as mine. You know, it wasn't so much my opinion depends on theirs, but it was my opinion is this. Oh, and by the way, these two guys, they agree with me. See, and I'm not clear on this distinction you're trying to make because experts typically, when they're testifying, for the basis of their opinion, rely on a number of factors. Learned treatises, other doctors' statements. And again, it's for the basis of the opinion, not substantive evidence. But nonetheless, it is for the basis of the opinion. Right, no, and I understand that. And the typical case is under... I mean, that has been around for a long time after Wilson v. Clark. Right. No, Wilson v. Clark has been around a long time, and it's been accepted in Illinois. And typically, you know, the cases we see these coming on are, you know, a DNA case where, you know, one doctor is saying, well, I got these results, and then a lab expert, and then I compared them, and I found the match. I didn't do the testing, but I found the match based on what someone else did. Or, you know, a psych eval that's based on, you know, well, another doctor, I got his records and reviewed them, and I got these test results and reviewed them. But, I mean, she's saying, I did this myself. I looked at these scans myself, and I formed an opinion. And my opinion is the child doesn't have this condition. But then I talked to these two other doctors. Not that my opinion is dependent on theirs, but they agree with me. That's where it's substantive evidence. I mean, those opinions are being offered not as the basis for hers, because they weren't the basis for hers. But they're being offered as, there are these two additional opinions that agree with me, and the defense has no chance to test those opinions, to cross-examine and explore exactly what those opinions are, and this case comes down to the particulars. When we're talking about the medical evidence, because it is disputed, and this is the key area of dispute, whether this child had this condition. I mean, that was the dispute at the very time of Wilson v. Clark, that if you can use as the basis for your opinion, other doctors or other experts' opinion, how do we cross-examine that? Well, that's left to the cross-examiner about what you utilize in forming the basis for your opinion. I mean, Wilson v. Clark made it clear that it's up to the cross-examiner. I don't disagree with Wilson v. Clark that it would apply in the right situation. I disagree that it applies here. I disagree that that was what happened here, because I disagree that this record shows that those other experts' opinions were the basis for hers. The basis for her opinion was her own evaluation of the scans, her own conclusion of what the condition was. She didn't testify that the basis was those other opinions. She testified, oh, these other doctors also have these opinions. So I guess, okay. So here, these additional opinions were improper and prejudicial because they bolstered her opinion, not explained it, weren't the basis for it, and the defense didn't have the opportunity to cross-examine the doctors who had those opinions. It's hearsay, is the argument we've made, because they're being admitted for the truth of the matter contained in those opinions, not just as a foundational basis for another expert's opinion. And the state didn't need to offer those opinions here, because Dr. Saving, who was before the court in testifying, had her own opinion, had formed her own opinion based on her own review. And so those were improperly admitted. Prejudicial because, again, the court specifically decided to rely on the state's experts because they were the ones who actually saw this child in assessing what happened in this case. Given the court's express reliance on the doctors that actually saw the child kind of leads us to the issue about defense counsel not presenting an expert that would have bolstered and corroborated the defense opinion here, and that was Dr. Spomar, who I discussed earlier, who examined the child at OSF. Dr. Plunkett testified this child had this increased fluid condition. The minor bump or a minor fall could have caused a subdural hematoma. It's known to cause that in children with this condition. Dr. Saving doesn't disagree with that. And Dr. Spomar would have supported the conclusion that he had that condition. Now, the states argued that it's cumulative, that it doesn't add anything to what was before the court, and so it wasn't deficient. Performance not to call Dr. Spomar wasn't prejudicial not to call him as a witness. Again, the court itself said it was persuaded by the doctors who actually saw the child. That was the only distinction the court made, really. It didn't find Dr. Plunkett not credible or his findings unreasonable, but chose to believe the doctors who actually saw the child. Dr. Spomar was one of those doctors, which is why his testimony would have been critical. Also, as I mentioned earlier, he's not your hired gun. He's not your hired defense expert. He is making these findings and treating the child at a time when only the child's interests were being considered by the doctor, not some later criminal case. And it's not cumulative because it directly contradicts the state witness on a key point. In the Ortiz case, we've cited for that proposition in the briefs. This was a hotly contested issue. This case hinged on the medical evidence because there was no direct evidence of any criminal act in this case. It's entirely circumstantial and those circumstances, the state's entire case, rose or fell on the medical evidence in this case. Counsel, your opinion. Thank you. For that reason, where there was no direct evidence of a crime and the case did hinge on the medical opinions, if this court doesn't agree with the first issue we've raised where we've asked for an outright reversal, we'd ask you to reverse and remand for a new trial on the basis I've discussed here today. And either of those can stand alone or together. Thank you, Your Honor. Thank you, Ms. Brison. Ms. Griffin. Good morning. May it please the Court, Counsel. I'd like to start out first with the alleged hearsay when Dr. Saving testified that she consulted with the neuroradiologist and the radiologist in coming to her conclusion that there was no extra axial fluid in this case. First, as I said before in our brief, I believe the defendant forfeited this issue. The defendant first made a hearsay objection to the testimony when the state's attorney that was handling the case stated that he would clarify what the purpose was for her testifying to this. The assistant state's attorney went forward. He clarified. Dr. Saving testified that she consulted with these radiologists in coming to her own conclusion. Thereafter, another objection was not made and a continuing objection to this testimony was not based on, was not made based on hearsay. I think this case falls squarely within the Wilson v. Clark case. Dr. Saving specifically testified that in her field it was common to consult with treating physicians, including radiologists and neuroradiologists, in making diagnosis and to rely on other doctors in coming to her ultimate opinion. Therefore, the records and what she relied on and who she talked to and what they told her was in fact admissible testimony in this case. Experts may testify about the findings and conclusions of a non-testifying expert that he used in forming his opinion. Saving specifically testified that after looking at the records in this case and consulting with the proper people that she testified to, it was her conclusion that there was no extra cranial fluid. And I'd like to touch upon the defendant's assertion that when the trial court stated it was considering the testimony of the treating physicians in this case, when Judge Rozak made that observation, he specifically referred to Dr. Saving, the treating physician at Morris Hospital, and the ophthalmologist in this case, Dr. Voren. Judge Rozak never mentioned the radiologist at all when he was talking about who he was relying on at that time. And, of course, it's presumed that a trial judge in a bench trial knows what the purpose was for the introduction of certain evidence and relies on proper evidence in coming to their determination. Unless that's demonstrated by the record that he did not consider it properly, we presume that he did, and in this case I think that applies. Regarding the fact that defense counsel did not call Dr. Spomar about the extra cranial fluid and also that the hematoma was small, while he was a doctor that saw the child at the hospital, all of the testimony regarding extra cranial fluid would come from looking at the MRI or the CT scan. It would not be based on a personal observation of the child. At defendant's brief, page 24 under argument one, she had much admits this. There the defendant stated that the testimony of the admitting doctor on the issue of whether or not there was extra cranial fluid would not be more instructive than a doctor that was reviewing a scan because the determination is not made in person, but by reading the scan. And that's exactly why Dr. Spomar's testimony would have been cumulative to Dr. Plunkett's because that's exactly what Dr. Plunkett did. Read the scan, stated that he believed there was extra cranial fluid. Dr. Saving looked at the scan and came to the conclusion that there was not extra cranial fluid. The trial judge in this case believed the state's witnesses and believed apparently that there was not, although I do take issue with the assertion that Saving agreed that if there was extra cranial fluid she would have agreed that it could have caused the subdural hematoma. Specifically, Dr. Saving stated that if a child does have extra axial fluid and she found that he did not, it is generally benign and usually does not cause problems. It has, however, been shown on rare occasions to be associated with a small subdural hematoma, and in fact Dr. Saving found that the subdural hematoma in this case was large. I believe Saving also testified that if there was extra cranial fluid it could have also occurred post-injury. So even if there was extra cranial fluid, the trial judge was not required to believe that that could have caused the injury in this case. The state's case, if believed, was wholly sufficient to find the defendant guilty beyond a reasonable doubt. There was an acute subdural hematoma which occurred on August 29, 2007. The evidence showed that the child was fine before being brought to the defendant's house and had an injury afterwards, that the child could not have afflicted the injuries on himself. The defendant basically admitted injury in her care, although she downplayed it. There were other injuries to the child's body on other axes of his body that could not have occurred at the same time as the head injury that he could have not sustained on his own. Dr. Voren, the ophthalmologist, testified that there was retinal hemorrhages from non-accidental trauma and to a reasonable degree of medical certainty it could not have occurred as the defendant stated. Dr. Johnson, who was the treating physician at Morris, the presentation of the child was not consistent with the defendant's version of events. But did either doctor, both doctors opined that this injury was non-accidental as caused by the child? Did either expert opine that the caretaker could not have accidentally dropped the child causing this injury? Because this is not a neglect or abuse case, this is an intentional act, you have to prove intent. No, neither of those doctors opined as to how it could have occurred, but they did state that it could not have occurred as the defendant stated. The way the defendant described it. So when the court found that it was non-accidental, what facts or expert opinion did the court rely on to find that this was an intentionally inflicted injury? Well, the court had before it the fact that... What did the court find? I don't believe the child court made specific... I mean, of course the court did specifically find that the defendant was proven guilty beyond a reasonable doubt. Dr. Saving testified that the injury did occur at the time that the child was at the daycare center. And I believe that the trial court could have considered that evidence along with the evidence, of course, that the defendant lied on the witness stand, which would be evidence of her guilt. She provided an accident report statement that was dated August 30, 2007, which was entirely inconsistent with her testimony given at trial and inconsistent with all of the other evidence that was presented by the other witnesses. What were the inconsistencies? For example, she stated that on the August 14th date, which was the first date that Kim Basham asked about an injury to the child's head, she stated that she didn't see any bump on the child's head. At trial, Kim stated that the defendant specifically told her that the baby had fallen backwards and hit his head on the floor. In the accident report statement, the defendant also stated that there was no visible injury by the time that Kim got to the house. That was entirely inconsistent with everybody who saw the child hours later who testified that he had a large goose egg on his head. It was inconsistent with the grandmother, whose granddaughter was also in the defendant's care, who testified that when she came to the house at approximately 345, that the victim was sitting in his chair crying and he had a goose egg on his head. So your point is she lied? It appears she lied, and the trial judge noted that. The trial judge certainly could rely on the fact that she lied on the stand, she lied in this accident statement as evidence of guilt. There were other injuries to the child. Is that evidence of intentionally harming the child,  I believe, yes, when she gives a version of events that if she did that, if she just accidentally hurt the child, why wouldn't she have just said that she accidentally hurt the child? I accidentally dropped him. Instead, she made up several versions of events as to what happened. She also stated in her accident report that when she called the house, she also called the house that night purportedly to check up on the child, even though, of course, she stated she didn't believe the child had injury, and stated that she called to ask Kim, the mother, to bring more diapers and formula to the house when Kim testified that she had just two days previously provided enough formula and diapers and other stuff that she provided for her just two days previously. She also testified that she wrongly telephoned the father's phone in the case thinking it was the mother's, and that he told her something about Kim had stopped by to talk about getting back together, and the evidence didn't bear that out either. So she was obviously calling because she was concerned about what she had done and trying to find out what happened. So I think that when you have doctors testifying that it was a non-accidental injury, that the injury happened at the time that the baby was in the defendant's care, and that it could not have occurred, as the defendant said, it was an intentional injury, and there were other injuries to the child's body that could not have occurred at the same time as the head injury, that the evidence was wholly sufficient in this case to find the defendant guilty, to be honest. The state expert excluded the possibility of an accidental injury. Yes. And I would note, too, that in Dr. Plunkett's testimony, the defendant's expert who relied on the defendant's version of events in coming to his conclusion never stated it could not happen as the state contended, but only stated that it could have happened, as the defendant stated. And that was opposite to the state's witnesses who said it could not have happened, as the defendant said. If there's no questions. Thank you. Thank you, Ms. Griffin. Ms. Bryson. I guess I'll start where counsel left off, with whether the defense expert not stating it could not have happened as the state was contending. Yeah. The defense expert didn't say that. I mean, he can't say it couldn't have happened that way. The state's experts say it couldn't have happened the way the defendant said, but they weren't taking into account this condition that the defense expert had identified, that it had been, the child had a preexisting condition. The opinions, especially, I mean, Dr. Saving, she was called in rebuttal. The other doctors weren't. They weren't taking into account the extra axial fluid being present. The doctor at the ER, the family doctor who testified, only Dr. Saving was later recalled to testify on that point. But I also want to touch base on Justice Wright's questions about did either of the doctors, the state's doctors, opine that it couldn't have been an accident, or what did the court rely on for finding this was intentional? And I think the state is making kind of a mountain out of a molehill in terms of what it has called Kelly's lying on the stand. They say she lied on the stand because someone else said something different. You know, Kelly said there was no visible injury by the time, you know, Kim came to pick up the child. The mother came to pick up the child. Someone else saw a visible injury an hour earlier. I mean, it's a goose egg. It's a bump. You know, kids, you know kids, you've hurt yourself, things swell up, the swelling goes down, what's visible to one person maybe, you know, isn't to another. I mean, that's not the end all, be all in this case, whether there was a bump is still visible at the time. There were inconsistent statements being made, which sometimes are considered consciousness of guilt. I think part of what I find problematic about that is the police never really investigated this case. You know, she didn't make a statement in response to questioning. She made this written statement. She testifies years later, you know, a year and a half later at trial, two years later at trial. And the state's kind of picking apart these things that aren't really related to what happened in this case. I mean, her statement is consistent about what happened to the child. He was up on all fours or he was pushed up on his arms. You know, he either reached for a toy or was trying to scoot for a toy. He was seven months old. I know he wasn't crawling out. The state makes a lot out of, well, he wasn't mobile. Well, he wasn't mobile means maybe he wasn't actively crawling or he wasn't walking. But babies are mobile in the sense that they move. You know, they're up and, you know, trying to keep going. She was very consistent about how the injury happened, what had happened on her watch. And the bump on the head bears that out. That is consistent with what she said, what she said to the parents, what she said in the written statement that she prepared. Because she was a licensed daycare, she prepared a written statement. And the state's expert says that's not possible. The state's expert says it's not possible if there's no extra axial fluid. Again, which is why I wanted to talk to the court today about the issues I did. Because that really is the key here if we're talking about, you know, could it have happened the way she said? It could have happened the way she said. And there's evidence to support that. There could have been more evidence to support that, you know, had the defense attorney brought that evidence forward. I mean, this is a close case and a tough case. Because she's the last adult with the child. And really that's the state's theory in this case. She's the last adult with this child. They mentioned it in their opening statement. They mentioned it in their closing argument that, you know, she was the last adult with this child. Are there other mobile children in there? There were her own son who was around two and another child around that age were both in her care at that time. When she says she witnessed the injury, those children were napping. When she saw the bump, you know, that he launched forward and hit, it said those children were napping. So as to that, thank you. But there were other mobile children in the house. No, but nobody competent to testify, you know, to what happened. I mean, there was another infant there at the time that this particular injury that she observed occurred. If the court doesn't have any other questions, obviously we've asked for a variety of relief in the briefs depending on, you know, which issue this court would care to grant relief on. And if you don't have any other questions, I thank you for your time today. Thank you. Thank you. And thank both of you for your argument today. We'll take this matter under advisement, get back to you with a written disposition within a short date. And after a short recess, we'll be back.